**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CHARLES HIGGINS and VISHAL SHAH, *individually and on behalf of all others similarly situated*,<br><br>Plaintiffs,<br><br>vs.<br><br>NESTLÉ HEALTH SCIENCE US HOLDINGS, INC., and NESTLÉ S.A.,<br><br>Defendants. | Case No. ________________<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

## I. INTRODUCTION

1. Plaintiff Charles Higgins is a retired executive residing in Cherry Hill, New Jersey. For approximately forty years, Mr. Higgins consumed a daily dose of the highly popular Solgar Formula VM-75 multivitamin supplement ("Solgar VM-75"). Solgar VM-75 contains 75 mg of vitamin B6 per daily dose—roughly 44 times the U.S. Recommended Dietary Allowance.

2. Plaintiff Vishal Shah is an analyst residing in Buena Park, California. Mr. Shah purchased and consumed Solgar VM-75 as a nutritional supplement to improve his general heath.

3. Solgar VM-75 was originally designed, manufactured, and distributed by the Solgar Vitamin & Herb Co. in 1975. After several changes in corporate ownership, Defendants Nestlé S.A. and Nestlé Health Science US Holdings, Inc. (collectively, "Nestlé") acquired the Solgar brand on August 9, 2021. Through that acquisition, Nestlé assumed responsibility for the design, formulation, manufacture, testing, labeling, marketing, and sale of Solgar VM-75, and thereafter continued to manufacture, market, and sell Solgar VM-75 to consumers nationwide.

4. Beginning in 2022, Mr. Higgins began to experience progressive deterioration in his gait, balance, and coordination, culminating in two falls in 2024. He was subsequently diagnosed with vitamin B6 toxicity (with a blood

serum vitamin B6 level of more than eight times the upper limit of normal) and vitamin B6-induced peripheral neuropathy, an often-irreversible nerve injury producing weakness, numbness, loss of balance, and chronic burning pain.

5. Mr. Higgins' peripheral neuropathy has been attributed by one or more of his physicians to his ingestion of high doses of vitamin B6. This is fully consistent with the well-established medical consensus, supported by decades of clinical research, case reports, and peer-reviewed medical literature dating back to at least 1983, that the prolonged use of high-dose vitamin B6 supplements like Solgar VM-75 can cause peripheral neuropathy and/or exacerbate existing neuropathy and other health problems.

6. Government regulators in the U.K., E.U., the Netherlands, and Norway have issued warnings and guidance establishing tolerable upper intake levels ("TULs") for vitamin B6 between 10 mg/day and 25 mg/day. Canada and Australia require manufacturers of vitamin supplements containing more than 10 mg per daily dose of vitamin B6 to carry labels warning consumers of the health risks of higher doses of vitamin B6. Regulators in New Zealand, Malaysia, and Singapore have also issued statements about the health risks without setting a TUL.

7. Nestlé knew or should have known of the decades-old scientific consensus that the 75 mg megadose of vitamin B6 contained in the daily dose of Solgar VM-75 can cause peripheral neuropathy and poses a serious health risk to

consumers. By contrast, neither Mr. Higgins nor reasonable consumers like him had any reason to be aware of that scientific consensus. Nevertheless, Nestlé does not include any warning of this known health risk on the label or packaging of Solgar VM-75. Instead, Nestlé touts Solgar VM-75 as a "premium multivitamin . . . designed to support overall health and well-being for optimal vitality."

8. Nestlé's labeling confirms that it knows how to place safety warnings on Solgar VM-75 when it chooses to do so. The Solgar VM-75 label bears a California Proposition 65 warning that consuming the product "can expose you to chemicals including lead, which [is] known to the State of California to cause cancer," yet it contains no warning that the product's 75 mg daily dose of vitamin B6 can cause peripheral neuropathy and/or exacerbate existing neuropathy and other health problems.

9. Had Nestlé informed Mr. Higgins and Mr. Shah that prolonged use of Solgar VM-75 could cause them to develop peripheral neuropathy or even increase their risk of Vitamin B6 toxicity, they would not have purchased and ingested it or continued doing so.

10. Mr. Higgins brings this action individually against Nestlé for strict products liability for failure to warn and design defect, and breach of express warranty, for which he seeks compensatory damages for his personal injuries and punitive damages.

11. Mr. Higgins and Mr. Shah (collectively, "Plaintiffs") also bring this action on behalf of themselves and all persons nationwide who purchased Solgar VM-75 for violations of the New Jersey Consumer Fraud Act, fraudulent concealment, breach of express and implied warranties, and unjust enrichment for Nestlé's misrepresentations and omissions concerning the safety of ingesting the high doses of vitamin B6 in Solgar VM-75 contained in the product's label and marketing materials.

12. On behalf of themselves and all others similarly situated, Plaintiffs seek compensatory damages for past economic harm, measured either by (1) the full amount they spent on purchasing Solgar VM-75 during the relevant time period (because they would not have bought the product had Nestlé warned them of the known health risk); (2) the monetary difference between the actual value of Solgar VM-75 at the time of purchase and what its value would have been if Nestlé had warned them of the known health risk (because, at minimum, they would have paid less but for Nestlé's misrepresentations and material omissions); and/or (3) the monetary difference between the actual value of Solgar VM-75 at the time of purchase and the price Plaintiffs paid for it.

13. On behalf of themselves and all others similarly situated, Plaintiffs also seek injunctive relief requiring Nestlé to (1) reformulate the amount of vitamin B6 in Solgar VM-75 to safe levels, and/or (2) add front-of-pack peripheral-

neuropathy warnings, and/or (3) make corrective disclosures on Solgar's website and packaging. They also seek punitive damages for the class for Nestlé's misconduct.

14. On June 22, 2026, Plaintiff Higgins through his counsel sent a letter to Nestlé Health Science requesting relief for its breach of express warranty, including that Nestlé Health Science reimburse Mr. Higgins and all others who purchased Solgar VM-75 for the amount they spent purchasing Solgar VM-75 and that Nestlé Health Science cease making express affirmations of fact about VM-75 without disclosing the health risk posed by VM-75. *See* Ex. A (Higgins Letter).

15. To date, Nestlé Health Science has not agreed to provide that relief.

16. In the alternative, Plaintiff Shah, on behalf of himself and a proposed Subclass of California residents who purchased Solgar VM-75, seeks compensatory and/or injunctive relief requiring Nestlé to (1) reformulate the amount of vitamin B6 in Solgar VM-75 to safe levels, and/or (2) add front-of-pack peripheral-neuropathy warnings, and/or (3) make corrective disclosures on Solgar's website and packaging.

17. On October 20, 2026, counsel for Plaintiff Shah sent notices by certified mail to Nestlé S.A. and Nestlé Health Science US in accordance with the California Consumers Legal Remedies Act ("CLRA") (Cal. Civil Code § 1782(a)) and the Song-Beverly Consumer Warranty Act (Cal. Civil Code § 871.24),

notifying Nestlé of its violations of applicable laws related to their marketing, promotion, and sale of Solgar VM-75 and demanding they correct or agree to correct the actions described therein within thirty (30) days of the notice letter. *See* Ex. B (Shah Letter). If Nestlé fails to do so, Plaintiff Shah will amend this Complaint to include a request for compensatory and punitive damages pursuant to California Civil Code § 1782(d).

## II. PARTIES

### A. Plaintiff Charles Higgins

18. Plaintiff Charles Higgins resides in Cherry Hill, New Jersey.

19. For approximately forty years, Mr. Higgins purchased and consumed a daily dose of Solgar VM-75. He did not do so because of any medical advice or diagnosed deficiency, but because he believed that daily multivitamin supplementation with Solgar VM-75 promoted overall health and well-being, just as Solgar advertised it does.

20. Mr. Higgins expected Solgar VM-75 to be safe to use as directed, of good and merchantable quality, and not defective. He had no reason to know or expect that the high amount of vitamin B6 contained in a daily dose of Solgar VM-75 could, and would, cause him to develop vitamin B6 toxicity and peripheral neuropathy. Had he known that, he would not have bought Solgar VM-75 or would have paid less for it.

**B. Plaintiff Vishal Shah**

21. Plaintiff Vishal Shah resides in Buena Park, California.

22. Mr. Shah has made multiple purchases of Solgar VM-75 and consumed it daily. He did not do so because of any medical advice or diagnosed deficiency, but because he believed that taking a daily multivitamin supplementation with Solgar VM-75 promoted overall health and well-being, just as Solgar advertised it does.

23. Mr. Shah expected Solgar VM-75 to be safe to use as directed, of good and merchantable quality, and not defective. He had no reason to know or expect that the high amount of vitamin B6 contained in a daily dose of Solgar VM-75 could cause vitamin B6 toxicity and peripheral neuropathy. Had he known that, he would not have bought Solgar VM-75 or would have paid less for it.

**C. Defendants**

**1. Defendant Nestlé S.A.**

24. Defendant Nestlé S.A. is a corporation organized and existing under the laws of Switzerland, with its principal place of business located in Vevey, Switzerland.

25. Nestlé S.A. is a multinational food and beverage conglomerate that, directly or through its subsidiaries, affiliates, and agents, conducts substantial business throughout the United States, including within this judicial district.

26. Since August 9, 2021, Nestlé S.A., directly or through its subsidiaries, has been responsible for the design, development, manufacture, testing, labeling, marketing, distribution, and sale of Solgar-branded vitamin and dietary supplement products, including Solgar VM-75.

### 2. Defendant Nestlé Health Science US Holdings, Inc.

27. Defendant Nestlé Health Science US Holdings, Inc. ("Nestlé Health Science") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Bridgewater, New Jersey.

28. Nestlé Health Science is a wholly owned subsidiary of Nestlé S.A. and is engaged in the business of developing, manufacturing, marketing, distributing, and selling health and nutritional products throughout the United States, including within this judicial district.

29. Upon information and belief, Nestlé Health Science is engaged in the business of developing, manufacturing, marketing, distributing, and selling the "Solgar" brand of vitamin supplement products, including Solgar VM-75, at a place of business and manufacturing facility in Leonia, New Jersey.

30. At all times relevant herein, Nestlé Health Science has been, and has acted as, an agent of Nestlé S.A., subject to Nestlé S.A.'s control.

## III. JURISDICTION

### A. Subject Matter Jurisdiction

31. This Court has subject matter jurisdiction over Plaintiff's class claims pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act because the amount in controversy exceeds $5,000,000, and Defendant Nestlé S.A. is a citizen of a foreign country and is thus diverse from Plaintiff and members of the proposed Class.

32. This Court has supplemental jurisdiction over Plaintiff Higgins' individual personal injury claims pursuant to 28 U.S.C. § 1367, because those claims are so related to the claims over which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

### B. Personal Jurisdiction : Nestlé S.A.

33. This Court has personal jurisdiction over Nestlé S.A. because Nestlé S.A. has sufficient contacts in this District that relate to the causes of action pleaded against its wholly owned subsidiary Nestlé Health Science.

34. Nestlé S.A.'s wholly owned subsidiary Nestlé Health Science has its U.S. corporate headquarters and Global Nestlé Product Technology Center in Bridgewater, New Jersey, and Nestlé Health Science's contacts in this District can be attributed to Nestlé S.A.

35. By headquartering its wholly owned subsidiary Nestlé Health Science in Bridgewater, New Jersey, by using Nestlé Health Science to manufacture Solgar VM-75 in Leonia, New Jersey, and by using Nestlé Health Science as its agent for marketing, distributing, and selling Solgar VM-75 to residents of this District and the United States, Nestlé S.A. itself has continuously and deliberately taken affirmative steps to make Solgar VM-75 available to consumers in New Jersey and California, including Plaintiffs and members of the proposed Class; has created continuing obligations between Nestlé S.A. and residents of the District; and has purposefully availed itself of the benefits and protections of conducting business in the District.

36. Plaintiffs' claims here arise directly out of Nestlé S.A.'s contacts with this District, particularly in that Plaintiffs could not even have purchased Solgar VM-75 but for Nestlé S.A.'s intentional acts of manufacturing Solgar VM-75 in Leonia, New Jersey and distributing and marketing Solgar VM-75 for sale to customers in this District and the United States as a whole, including Plaintiffs and members of the proposed Class.

37. On information and belief, Nestlé S.A. employees and representatives regularly visit Nestlé Health Science in New Jersey, thereby continuously conducting business in this District.

38. The foregoing constitutes a strong relationship between Nestlé S.A., this District, and the allegations herein, and creates a sufficient basis to render the exercise of jurisdiction over Nestlé S.A. by this Court permissible under traditional notions of fair play and substantial justice.

**C. <u>Personal Jurisdiction: Nestlé Health Science</u>**

39. This Court has personal jurisdiction over Nestlé Health Science because Nestlé Health Science is authorized to do business in this District, conducts substantial business in the District, has its principal place of business in the District, is at home in the District, and some of the actions giving rise to the complaint took place in the District.

40. Each of these facts independently is, and all of these facts together are, sufficient to render the exercise of jurisdiction by this Court over Nestlé Health Science permissible under traditional notions of fair play and substantial justice.

## IV. <u>VENUE</u>

41. Venue is proper in this District under 28 U.S.C. § 1391 because Defendants, as corporations, are deemed to reside in any judicial district in which they are subject to personal jurisdiction.

42. Additionally, Defendants transact business within this District, Nestlé Health Science has its principal place of business in this District, and many of the events establishing the claims occurred in this District.

## V. APPLICABLE LAW

43. Plaintiff Higgins brings this action individually against Nestlé for strict products liability for failure to warn and design defect, and breach of express warranty under the New Jersey Product Liability Act (NJPLA), for which he seeks his individual compensatory and punitive damages for his personal injuries. New Jersey law should govern his individual claims because Plaintiff is a resident of New Jersey, his injuries occurred in New Jersey, and Nestlé Health Science has its headquarters in New Jersey, manufactures Solgar VM-75 in New Jersey, and markets and distributes Solgar VM-75 from New Jersey. Thus, New Jersey has the most significant relationship with the parties and the claims asserted.

44. Plaintiffs also seek damages and equitable relief on behalf of themselves and members of a nationwide class of consumers under New Jersey law. New Jersey law should govern the claims of the nationwide class because New Jersey has a significant relationship both to the parties to the litigation and to the misconduct at issue. Nestlé Health Science has its headquarters in New Jersey, manufactures Solgar VM-75 in New Jersey, and distributes and markets Solgar VM-75 from New Jersey.

45. As a result, New Jersey has a significant interest in regulating the conduct of a corporation whose principal place of business within the United States is in New Jersey.

46. New Jersey also has a significant aggregation of contacts to the claims of each member of the proposed Class such that application of New Jersey law to the claims of all members of the proposed Class is neither arbitrary nor fundamentally unfair to Nestlé or members of the proposed Class.

47. In the alternative, Plaintiff Shah seeks damages and/or equitable relief on behalf of himself and a California Subclass under the California Consumer Legal Remedies Act (CLRA), California Unfair Competition Law (UCL), the Song-Beverly Consumer Warranty Act (Song-Beverly), and California common law.

48. In the further alternative, Plaintiffs seek damages and equitable relief under the respective state laws applicable to Plaintiffs and all members of the proposed Class, which are substantially similar with respect to these facts and legal claims, and/or can be subdivided into a small number of groups to reflect any material differences in the law with respect to these claims.

# VI. FACTUAL ALLEGATIONS

## A. Well-Established Medical Consensus Concludes That the Prolonged Use of High-Dose Vitamin B6 Supplements Causes Peripheral Neuropathy

49. Vitamin B6 ("pyridoxine") is an essential, water-soluble vitamin naturally present in a variety of foods and frequently used in many over-the-counter vitamin and mineral supplements and in fortified food and beverage products such as energy drinks.

50. The U.S. National Institutes of Health ("NIH") set the Recommended Dietary Allowance ("RDA") of vitamin B6 at 1.3-1.7 mg per day for most adults.[1]

51. It is a well-established medical consensus, supported by decades of clinical research, case reports, and peer-reviewed medical literature, that the long-term use of high-dose vitamin B6 supplements can cause peripheral neuropathy and/or exacerbate existing neuropathy and other health problems.

52. In 1983, the *New England Journal of Medicine* published a landmark study describing seven adults who developed peripheral neuropathy after daily high-level vitamin B6 consumption. The authors concluded that consumption of

[1] National Institutes of Health, *Vitamin B6 Fact Sheet for Health Professionals* (June 16, 2023), https://ods.od.nih.gov/factsheets/VitaminB6-HealthProfessional/.

high doses of vitamin B6 can cause neuropathy and recommended that "safe guidelines should be established for the use of this widely abused vitamin."[2]

53. In 1985, *Neurology* published a follow-up study describing sixteen adults who developed neuropathy from high doses of vitamin B6, noting that "[a]ll patients had read or been told that no harm could come from massive doses because any excess would be excreted in the urine." The study concluded that the sixteen patients reported in the study and the seven previously reported in the *New England Journal of Medicine* study "present a clear clinical picture that should be easily recognized. Pyridoxine causes a pure sensory, length-dependent, axonal neuropathy…."[3]

54. In 1992, *Neurology* published the results of a prospective study in which healthy volunteers were given large doses of vitamin B6. The study found that "[i]n all subjects, sensory symptoms and quantitative sensory threshold

---

[2] Herbert Schaumburg *et al.*, *Sensory Neuropathy from Pyridoxine Abuse: A New Megavitamin Syndrome*, NEW ENGLAND JOURNAL OF MEDICINE, 1983;309(8):445-448, https://mayoclinic.elsevierpure.com/en/publications/sensory-neuropathy-from-pyridoxine-abuse-a-new-megavitamin-syndro/.

[3] Gareth J. Parry and Dale E. Bredesen, *Sensory neuropathy with low-dose pyridoxine*, NEUROLOGY, 1985;35:1466-1468, https://www.neurology.org/doi/10.1212/wnl.35.10.1466?url_ver=Z39.88-2003&rfr_id=ori:rid:crossref.org&rfr_dat=cr_pub%20%200pubmed.

abnormalities occurred concurrently, confirming a clear dose-response relationship for pyridoxine-induced neuropathy."[4]

55. Multiple additional case reports, clinical studies, and literature reviews have confirmed that high doses of vitamin B6 cause peripheral neuropathy or worsen existing peripheral neuropathy, concluding, for example, that:

- "Excessive pyridoxine causes neurological injury."[5]
- "Over-the-counter vitamins and supplements contain vitamin B6 levels sufficient to cause toxicity when taken as directed."[6]
- "Peripheral neuropathy is a known side effect of vitamin B6."[7]
- "The complications of pyridoxine (or vitamin B6) toxicity are well known among neurologists due to the prevalence of peripheral neuropathy among this group."[8]
- "Vitamin B6 (pyridoxine) toxicity is a known cause of neuropathy. As a water soluble vitamin, the majority of pyridoxine toxicity is due to excessively high doses found in OTC nutritional supplements."[9]

---

[4] A.R. Berger *et al.*, *Dose response, coasting, and differential fiber vulnerability in human toxic neuropathy: A prospective study of pyridoxine neurotoxicity*, NEUROLOGY, 1992 Jul;42(7):1367-70, https://www.neurology.org/doi/10.1212/wnl.42.7.1367?url_ver=Z39.88-2003&rfr_id=ori:rid:crossref.org&rfr_dat=cr_pub%20%200pubmed.

[5] Royal Australian College of General Practitioners, *Pyridoxine toxicity from over-the-counter supplements*, 2025.

[6] *Id.*

[7] New Zealand Medicines and Medical Devices Safety Authority, *Vitamin B6 (pyridoxine) and peripheral neuropathy*, (2025).

[8] *Pyridoxine toxicity among lung transplant recipients*, INTERNAL MEDICINE JOURNAL (2026).

[9] *Vitamin B6 (pyridoxine) Toxicity and OTC Supplements*, NEUROLOGY (2021).

- "[P]atient experienced a worsening of a pre-existing PN [peripheral neuropathy] of another etiology associated with Vitamin B6."[10]

56. Vitamin B6-induced neuropathy is characterized by symmetric, progressive impairments in touch, pin-prick, temperature, vibrational, and positional sense at the extremities. Patients can also experience ataxia and disequilibrium, hyperesthesia, bone pain, muscle weakness, numbness, and difficulty with ambulation.[11] The most common symptoms reported in patients with elevated vitamin B6 levels and peripheral neuropathy include numbness (96%), tingling (57.7%), burning pain (49.9%), balance difficulties (30.7%), and weakness (7.8%).[12]

57. Although several of the foundational studies described above involved daily doses higher than 75 mg, the medical and regulatory record establishes that peripheral neuropathy can result from far lower doses and from the cumulative

---

[10] Natalie Gdynia, Andreas Gratzer, and Hans-Jurgen Gdynia, *Polyneuropathy Due to Vitamin B6 Hypervitaminosis: a Case Series and Call for More Education*, JOURNAL OF NEUROSCIENCES IN RURAL PRACTICE, 2025 January-March;16(1): 99-103, https://ruralneuropractice.com/content/150/2025/16/1/pdf/JNRP-16-099.pdf.

[11] Felix Hadtstein and Misha Vrolijk, *Vitamin B-6-Induced Neuropathy: Exploring the Mechanisms of Pyridoxine Toxicity*, ADV. NUTR. 2021 Oct 1;12(5):1911-1929, https://pmc.ncbi.nlm.nih.gov/articles/PMC8483950/.

[12] K. Scott *et al.*, *Elevated B6 levels and peripheral neuropathies*, ELECTROMYOGR. CLIN. NEUROPHYSIOL, 2008 Jun-Jul;48(5):219-23, https://pubmed.ncbi.nlm.nih.gov/18754531/.

dose ingested over time. Regulators and scientific bodies have concluded that neuropathy can occur at intakes of 50 mg per day or less, and that the total dose accumulated over months or years—not merely the size of a single daily dose—predicts the risk of toxic injury. Consistent with this record, the Australian Therapeutic Goods Administration, in its November 2025 final decision amending the Poisons Standard, concluded that there is "sufficient evidence to conclude peripheral neuropathy may occur in some individuals with vitamin B6 intake of 50 mg/day or even lower," well below the 75 mg contained in a single daily dose of Solgar VM-75. Mr. Higgins' experience is consistent with this record: he ingested 75 mg of vitamin B6 every day for approximately forty years, his serum vitamin B6 measured more than eight times the upper limit of normal, and his level returned to normal only after he discontinued Solgar VM-75.

### B. Governmental Regulators Issue Warnings About the Health Risks of High Doses of Vitamin B6

58. As a result of the medical consensus that the long-term use of high-dose vitamin B6 supplements can cause peripheral neuropathy, multiple governmental regulatory agencies have taken regulatory action, including by requiring warning labels and establishing tolerable upper intake levels, as set forth below.

59. Citing the known risk of peripheral neuropathy from high doses of vitamin B6 and 250 related adverse event reports as of October 31, 2025, the

Australian Therapeutic Goods Administration requires all products containing recommended daily doses of vitamin B6 over 10 mg to carry a warning label about peripheral neuropathy. In November 2025, the Therapeutic Goods Administration further determined that products providing more than 50 mg but not more than 200 mg of vitamin B6 per day will be available only with pharmacist oversight, and products providing more than 200 mg per day only by prescription, with those scheduling changes to take effect on June 1, 2027.[13]

60. Health Canada also requires all products containing recommended daily doses of vitamin B6 over 10 mg to carry a warning label.[14]

61. Other regulatory bodies have issued guidance and/or warnings establishing Tolerable Upper Intake Levels ("TULs") for products containing vitamin B6. A TUL is "the maximum level of total chronic daily intake of a nutrient (from all sources) which is not expected to pose a risk of adverse health

---

[13] Australian Therapeutic Goods Administration, Medicine Safety Update, *Medicines containing vitamin B6 (pyridoxine, pyridoxal or pyridoxamine)*, Feb. 19, 2026, https://www.tga.gov.au/news/safety-updates/medicines-containing-vitamin-b6-pyridoxine-pyridoxal-or-pyridoxamine. (Nov. 2025), https://www.tga.gov.au/sites/default/files/2025-11/notice-final-decision-to-amend-current-poisons-standard-pyridoxine-pyridoxa-pyridoxamine-vitamin-b6.pdf.*Notice of final decision to amend (or not amend) the current Poisons Standard – pyridoxine, pyridoxal, pyridoxamine (vitamin B6)* See also Therapeutic Goods Administration,

[14] Government of Canada, *Summary Safety Review - Vitamin B6 Health Products - Assessing the Potential Risk of Peripheral Neuropathy*, https://dhpp.hpfb-dgpsa.ca/review-documents/resource/SSR1773147434487.

effects to humans. . . . The [TUL] is not a recommended level of intake. As the intake increases above the [TUL], the risk of adverse effects increases."[15] The TULs for vitamin B6 set by these regulatory bodies are as follows:

| **Regulatory Agency** | **TUL** |
|---|---|
| UK Expert Group on Vitamins and Minerals (EVM) | 10 mg[16] |
| European Food Safety Authority (EFSA) | 12 mg[17] |
| Norwegian Scientific Committee for Food Safety | 25 mg[18] |
| Netherlands Pharmacovigilance Centre Lareb | 12 mg[19] |

---

[15] EFSA Panel on Nutrition, Novel Foods and Food Allergens, *Guidance for establishing and applying tolerable upper intake levels for vitamins and essential minerals*, EFSA J. 2022 Jan 24;20(1), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC8784980/.

[16] UK Expert Group on Vitamins and Minerals (EVM), *Safe Upper Levels for Vitamins and Minerals*, May 2003, https://cot.food.gov.uk/sites/default/files/vitmin2003.pdf.

[17] European Food Safety Authority (EFSA), *Scientific opinion on the tolerable upper intake level for vitamin B6*, March 29, 2023, https://efsa.onlinelibrary.wiley.com/doi/epdf/10.2903/j.efsa.2023.8006.

[18] Norwegian Scientific Committee for Food Safety, *Assessment of vitamin B6 intake in relation to tolerable upper intake levels*, 2017, https://nva.sikt.no/registration/0198cc5f0e9f-2e8d8026-6686-43b7-812c-36c22e6bfb64.

[19] Netherlands Pharmacovigilance Centre Lareb, *Nerve damage due to the use of nutritional supplements with vitamin B6*, 2024, https://www.lareb.nl/en/news/nerve-damage-due-to-the-use-of-nutritional-supplements-with-vitamin-b6/.

62. In the United States, the National Institutes of Health has recognized that the prolonged use of high doses of vitamin B6 "can cause severe and progressive sensory neuropathy," but has established a TUL of 100 mg/day.[20]

63. Regulators in New Zealand, Malaysia, and Singapore have also issued statements about the risks of vitamin B6 without setting a TUL.[21]

64. The regulatory record further confirms the long-standing and well-recognized nature of this risk. The United Kingdom has restricted the sale of vitamin B6 in doses above 50 mg per day to prescription-only status since 1997. Australia reduced the maximum permitted daily dose of vitamin B6 in individual products from 200 mg to 100 mg effective in 2023, and in its November 2025 final decision amending the Poisons Standard, the Australian Therapeutic Goods Administration expressly rejected industry claims that neuropathy occurs only at very high doses or with long-term use, finding instead that peripheral neuropathy may occur in some individuals at intakes of 50 mg per day or lower. The

[20] National Institutes of Health, *Vitamin B6 Fact Sheet for Health Professionals* (June 16, 2023), https://ods.od.nih.gov/factsheets/VitaminB6-HealthProfessional/.

[21] New Zealand Medicines and Medical Devices Safety Authority, *Vitamin B6 (pyridoxine) and peripheral neuropathy*, June 2025, https://www.medsafe.govt.nz/profs/PUArticles/June2025/Vitamin-B6-and-peripheral-neuropathy.html; Ministry of Health Malaysia, National Pharmaceutical Regulatory Agency (NPRA), *Vitamin B6 (Pyridoxine): Risk of Peripheral Neuropathy*, Jan. 27, 2026, https://www.npra.gov.my/index.php/en/industry/more-regulations/recent-updates/475-english/safety-alerts-main/safety-alerts-2026/1527818-vitamin-b6-pyridoxine-risk-of-peripheral-neuropathy.html.

Therapeutic Goods Administration found that the adverse-event reports it received "contrast with industry submissions claiming that neurological adverse events from vitamin B6 only occur at high doses and with long-term usage," and it observed that the industry-cited paper recommending a higher tolerable dose was authored entirely by individuals who "received honorarium from various major manufacturers of vitamin B6 products."

### C. Nestlé's Marketing of Solgar VM-75 and Concealment of Its Health Risks

65. Solgar VM-75 was first developed, manufactured, and sold by Solgar Vitamin & Herb Co. in 1975.

66. In 1998, Solgar Vitamin and Herb Co. was purchased by American Home Products Corporation, and Solgar Vitamin and Herb Co. became a division of American Home Products Corporation (which subsequently became Wyeth Pharmaceuticals Inc.).

67. In 2005, NBTY Inc. (now The Bountiful Company, owned by the investment firm KKR) acquired the assets of the Solgar division of Wyeth and the Solgar brand.

68. On August 9, 2021, Nestlé Health Science acquired the Solgar brand—together with other core brands of The Bountiful Company—from KKR for approximately US$5.75 billion. Through that acquisition, Nestlé assumed responsibility for the design, formulation, manufacture, testing, labeling,

marketing, and sale of Solgar VM-75, and thereafter continued to manufacture, market, and sell Solgar VM-75 to consumers nationwide without any warning of its known health risks.

69. The brands Nestlé acquired in that transaction generated approximately US$1.87 billion in net sales in the twelve months preceding the acquisition, reflecting the substantial revenue Nestlé derived from the acquired Solgar and related supplement brands.

70. Since no later than 1983, Solgar and Nestlé have known, or should have known, that the long-term use of Solgar VM-75—with its 75 mg daily megadose of vitamin B6—can cause peripheral neuropathy and/or exacerbate existing neuropathy and other health problems.

71. Nestlé's knowledge of this risk is confirmed by, among other things, the long-standing and public foreign regulatory record. The United Kingdom has restricted vitamin B6 in doses above 50 mg per day to prescription-only status since 1997—decades before Nestlé acquired the Solgar brand. As a global food, beverage, and health-science company with substantial scientific and regulatory expertise, Nestlé knew or should have known, no later than its August 9, 2021 acquisition of the Solgar brand, of these foreign regulatory restrictions and the scientific literature underlying them.

72. Nestlé's knowledge is further confirmed by regulatory action taken during its ownership of the Solgar brand. Effective March 1, 2022—after Nestlé acquired Solgar—the Australian Therapeutic Goods Administration required all products containing recommended daily doses of vitamin B6 over 10 mg to carry a warning that the product can cause peripheral neuropathy. As a multinational seller of vitamin and supplement products in Australia and worldwide, Nestlé knew or should have known of this warning requirement and the peripheral-neuropathy risk it addressed.

73. Nestlé's own conduct demonstrates both its awareness of, and its capability to provide, ingredient-level safety warnings on Solgar VM-75. The Solgar VM-75 label already bears a California Proposition 65 warning disclosing that the product can expose consumers to lead. Nestlé thus maintains the infrastructure and practice of placing ingredient-specific health warnings on Solgar VM-75, yet has never warned consumers of the peripheral-neuropathy risk posed by the product's 75 mg daily dose of vitamin B6.

74. Nevertheless, Solgar and Nestlé marketed and continue to market Solgar VM-75 as a "premium multivitamin . . . designed to support overall health and well-being for optimal vitality."[22]

[22] https://www.solgar.com/products/formula-vm-75-tablets

75. None of Solgar or Nestlé's advertisements or labeling warned consumers that the daily dose of Solgar VM-75 contained amounts of vitamin B6 known to constitute a risk of developing or worsening peripheral neuropathy. The label of Solgar VM-75 is as follows:







76. Plaintiffs and members of the proposed Class were exposed to Solgar and Nestlé's marketing and labeling of Solgar VM-75, and they justifiably chose to purchase Solgar VM-75 based on Nestlé's knowingly misleading marketing, which concealed the known health risk posed by Solgar VM-75.

### D. Plaintiff Higgins' Consumption of Solgar VM-75 Caused Him to Develop Peripheral Neuropathy

77. Mr. Higgins consumed Solgar VM-75 daily for approximately forty years, not on advice of a doctor or with a diagnosed deficiency, but in the belief that daily multivitamin supplementation promoted general health, just as Solgar promised.

78. Beginning in 2022, Mr. Higgins experienced progressive deterioration in gait, balance, and coordination, culminating in two falls in 2024 and 2025. Electromyography ("EMG") testing at Cooper University Hospital and Penn Medicine confirmed a diagnosis of peripheral neuropathy.

79. In May 2025, Penn Medicine diagnosed Mr. Higgins with vitamin B6 toxicity: his blood serum vitamin B6 was 409 nmol/L—more than eight times the upper limit of the normal reference range (~50 nmol/L).

80. Upon discontinuation of Solgar VM-75, Mr. Higgins' vitamin B6 level returned to normal. One or more of his physicians have attributed Mr. Higgins' peripheral neuropathy to his ingestion of high doses of vitamin B6, concluding B6 toxicity caused his neuropathy, having excluded diabetes mellitus, alcohol use, autoimmune disease, vitamin B12 deficiency, paraproteinemia, and chemotherapy exposure as alternative etiologies.

81. Treatment has slowed or arrested the progression of Mr. Higgins' neuropathy symptoms, but his physicians do not anticipate material improvement

in his existing neurological deficits, which are substantial and have greatly affected his enjoyment of routine activities.

**E. Fraudulent Concealment Allegations**

82. Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at Nestlé responsible for disseminating false and misleading marketing materials regarding Solgar VM-75. Nestlé necessarily is in possession of all of this information.

83. Plaintiffs' claims arise out of Nestlé's failure to disclose and/or fraudulent concealment of the health risk posed by Solgar VM-75, and its representations about the health benefits of Solgar VM-75.

84. Nestlé was under a duty to disclose the health risk posed by Solgar VM-75 because it had superior knowledge of those health risks, knew that those health risks were material facts that would affect Plaintiffs' and/or members of the proposed Class' decisions to buy Solgar VM-75, and intentionally concealed the foregoing from Plaintiffs and members of the proposed Class.

85. To the extent that Plaintiffs' claims arise from Nestlé's failure to disclose and/or fraudulent concealment, there is no one document or communication, and no one interaction, upon which they base their claims. Plaintiffs allege that at all relevant times, Nestlé knew, or was reckless in not

knowing, of the health risk posed by Solgar VM-75; Nestlé was under a duty to disclose the health risk posed by Solgar VM-75; and Nestlé never disclosed the health risk posed by Solgar VM-75 to Plaintiffs or the public at any time or place or in any manner, including on its label.

86. Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Nestlé:

a. **Who**: Nestlé failed to disclose and/or actively concealed the health risk posed by Solgar VM-75 from Plaintiffs and members of the proposed Class while simultaneously touting the health benefits of Solgar VM-75, as alleged herein. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at Nestlé responsible for such decisions.

b. **What**: Nestlé knew, or was reckless in not knowing, that the high amounts of vitamin B6 in the daily dose of Solgar VM-75 posed a health risk to consumers starting no later than 1983, as alleged above. Nestlé did not disclose and/or actively concealed the health risks and made representations about the health benefits of Solgar VM-75, as specified above.

c. **When**: Nestlé did not disclose and/or actively concealed material information regarding the health risk posed by Solgar VM-75 at all times and made representations about the health benefits of Solgar VM-75, starting no

later than 1983, continuing through the time of sale, on an ongoing basis, and continuing to this day, as alleged above. Nestlé has never taken any action to inform consumers about the health risk posed by Solgar VM-75.

d. **Where**: Nestlé did not disclose and/or actively concealed material information regarding the health risk posed by Solgar VM-75 in every communication it had with Plaintiffs and members of the proposed Class and made representations about the health benefits of Solgar VM-75. Plaintiffs are aware of no document, communication, or other place or thing, in which Nestlé disclosed the health risk posed by Solgar VM-75 to Plaintiffs, members of the proposed Class, or the general public. Such information is not adequately disclosed in any labels, packaging, sales documents, displays, advertisements, or on Nestlé's website.

e. **How**: Nestlé concealed the health risk posed by Solgar VM-75 from Plaintiffs and members of the proposed Class and made representations about the health benefits of Solgar VM-75. Nestlé did not disclose and/or actively concealed the truth about the existence and nature of the health risk posed by Solgar VM-75 from Plaintiffs and members of the proposed Class at all times, even though it knew about the health risk posed by Solgar VM-75 and knew that information about the health risk posed by Solgar VM-75 would be important to a reasonable consumer.

f. **Why**: Nestlé did not disclose and/or actively concealed material information about the health risk posed by Solgar VM-75 for the purpose of inducing Plaintiffs and members of the proposed Class to purchase Solgar VM-75, rather than purchasing competitors' multivitamin supplements, and made representations about the health benefits of Solgar VM-75. Had Nestlé disclosed the truth, for example on the label of Solgar VM-75 or in advertisements or other materials or communications about Solgar VM-75, Plaintiffs and members of the proposed Class (all reasonable consumers) would have been aware of it, and would not have bought Solgar VM-75 or would have paid less for it.

## VII. TOLLING OF THE STATUTE OF LIMITATIONS

### A. Fraudulent Concealment Tolling

87. Nestlé has known, or should have known, of the health risk posed by Solgar VM-75 since no later than 1983, and yet actively concealed from and/or failed to disclose to Plaintiffs, members of the proposed Class, and the public the health risk posed by Solgar VM-75. Nestlé continues to conceal the health risk posed by Solgar VM-75 to this day and has undertaken no steps to inform Plaintiffs or members of the proposed Class of it.

88. Any applicable statute of limitation has been tolled by Nestlé's knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**B. <u>Estoppel</u>**

89. As detailed above, Nestlé was and is under a continuous duty to disclose to Plaintiffs and members of the proposed Class the true character, quality, and nature of Solgar VM-75. Instead, Nestlé actively concealed—and continues to conceal—the true character, quality, and nature of Solgar VM-75 and knowingly makes misrepresentations about the health benefits of Solgar VM-75. Plaintiffs and members of the proposed Class reasonably relied upon Nestlé's knowing misrepresentations and active concealment of these facts. Based on the foregoing, Nestlé is estopped from relying on any statutes of limitation in defense of this action.

**C. <u>Discovery Rule</u>**

90. The causes of action alleged herein did not accrue until Plaintiffs and members of the proposed Class discovered the health risk posed by Solgar VM-75.

91. However, Plaintiffs and members of the proposed Class had no realistic ability to discern that Solgar VM-75 was defective or unreasonably dangerous. For most consumers, such as Mr. Higgins and Mr. Shah, that discovery did not and could not occur within the limitations period, because Nestlé concealed the risk and the product bore no warning.

## VIII. <u>CLASS ALLEGATIONS</u>

**A. <u>Nationwide Class</u>**

92. Plaintiffs bring certain claims in this lawsuit as a class action on behalf of themselves and all other similarly situated individuals as a nationwide class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2), (b)(3), and/or (c)(4). This action satisfies the numerosity, ascertainability, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

93. Plaintiffs bring this class action as a nationwide class on behalf of themselves and all other similarly situated individuals, defined as follows:

> **All residents of the United States and its territories who purchased Solgar Formula VM-75.**

94. This definition may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

**B. <u>California Subclass</u>**

95. In the alternative, Plaintiff Shah brings certain claims in this lawsuit as a class action on behalf of a California Subclass, defined as follows:

> **All residents of California who purchased Solgar Formula VM-75.**

96. This definition may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

97. Excluded from the Nationwide Class and the California Subclass are: (1) employees of Nestlé; (2) any judge assigned to this case and their respective families; (3) government entities; and (4) claims for personal injuries, emotional distress, and wrongful death.

**B. <u>Numerosity and Ascertainability</u>**

98. Although the exact number of members of the proposed Class is uncertain and can only be ascertained through appropriate discovery, based upon the long-time and wide-spread sales of Solgar VM-75, the number is great enough such that joinder is impracticable.

**C. <u>Typicality</u>**

99. The claims of Plaintiffs are typical of the claims of members of the proposed Class in that Plaintiffs, like all members of the proposed Class, purchased Solgar VM-75 designed, manufactured, distributed, warranted, marketed, and sold by Nestlé. Plaintiffs, like all members of the proposed Class, were injured by Nestlé's misconduct and suffered actual damages in that they purchased a product they would not have purchased, or for which they would have paid less, but for Nestlé's misconduct. Furthermore, the factual bases of Nestlé's misconduct are common to Plaintiffs and all members of the proposed Class and represent a common thread of misconduct resulting in injury to Plaintiffs and all members of the proposed Class.

**D. Adequate Representation**

100. Plaintiffs will fairly and adequately represent and protect the interests of the members of the proposed Class. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions including in this District.

101. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the proposed Class, and they have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the members of the proposed Class.

**E. Predominance of Common Issues**

102. There are numerous questions of law and fact common to Plaintiffs and members of the proposed Class, the answers to which will advance the resolution of the litigation as to all members of the proposed Class and which predominate over any individual questions. These common legal and factual issues include:

a. whether Solgar VM-75 poses a health risk, specifically development of vitamin B6 toxicity and resulting peripheral neuropathy;

b. whether and when Nestlé knew or should have known about the health risk posed by Solgar VM-75, and, if so, how long Nestlé knew or should have known of the health risks;

c. whether the health risk posed by Solgar VM-75 constitutes a material fact reasonable consumers would have considered in deciding whether to purchase Solgar VM-75;

d. whether Nestlé had and/or has a duty to disclose the health risk posed by Solgar VM-75 to Plaintiffs and members of the proposed Class;

e. whether Nestlé omitted and failed to disclose material facts about Solgar VM-75 by failing to disclose the health risk it poses;

f. whether Nestlé's concealment of the health risk posed by Solgar VM-75 induced Plaintiffs and members of the proposed Class to act to their detriment by purchasing Solgar VM-75;

g. whether Nestlé represented, through its words and conduct, that Solgar VM-75 had characteristics, uses, or benefits that it did not actually have;

h. whether Nestlé represented, through its words and conduct, that Solgar VM-75 was of a particular standard, quality, or grade when it was of another;

i. whether Nestlé advertised Solgar VM-75 with the intent not to sell it as advertised;

j. whether Nestlé's affirmative misrepresentations about the health benefits of Solgar VM-75 were likely to create confusion or misunderstanding, and were therefore fraudulent;

k. whether Nestlé's affirmative misrepresentations about the health benefits of Solgar VM-75 were and are deceptive;

l. whether Solgar VM-75 was unfit for the ordinary purposes for which it was used, in violation of the implied warranty of merchantability;

m. whether Plaintiffs and the other members of the proposed Class are entitled to a declaratory judgment stating that Solgar VM-75 poses a health risk and/or is not merchantable;

n. whether Plaintiffs and members of the proposed Class are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and,

o. whether Nestlé should be declared financially responsible for notifying members of the proposed Class of the health risk posed by Solgar VM-75.

**F. <u>Superiority</u>**

103. Plaintiffs and members of the proposed Class have all suffered and will continue to suffer harm and damages as a result of Nestlé's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

104. Absent a class action, most members of the proposed Class would likely find the cost of litigating their claims prohibitively high and would therefore

have no effective remedy at law. Because of the relatively small size of individual Class members' claims, it is likely that few if any members of the proposed Class could afford to seek legal redress for Nestlé's misconduct. Absent a class action, members of the proposed Class will continue to incur damages, and Nestlé's misconduct will continue without remedy.

105. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the Court and the litigants, and will promote consistency and efficiency of adjudication.

## IX. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Breach of Express Warranty by Affirmation, Promise, Description, or Sample (On behalf of Plaintiffs and the Proposed Nationwide Class against Nestlé Health Science only)

106. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

107. Nestlé Health Science is and was at all relevant times a "merchant" with respect to Solgar VM-75 under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of goods, and specifically of Solgar VM-75, under N.J. Stat. Ann. § 12A:2-103(1)(d).

108. Solgar VM-75 is and was at all relevant times a "good" within the meaning of N.J. Stat. Ann. § 12A:2-105(1) and § 12A:2A-103(1)(h).

109. N.J. Stat. Ann. § 12A:2-313(1)(a)-(b) states that a merchant creates an express warranty by making to the buyer "[a]ny affirmation of fact or promise … which relates to the goods and becomes part of the basis of the bargain" and "any description of the goods which is made part of the basis of the bargain."

110. Plaintiffs and members of the proposed Nationwide Class bought Solgar VM-75 manufactured and marketed by Nestlé Health Science and through Nestlé Health Science's authorized sellers for retail sale to consumers, such as Plaintiffs and members of the proposed Nationwide Class, or were otherwise expected to be the third-party beneficiaries of Nestlé Health Science's contracts with authorized sellers, or eventual purchasers when bought from a third party.

111. Nestlé Health Science made affirmations of fact that Solgar VM-75 was safe to consume at the suggested daily dose, representing that Solgar VM-75 was a "premium multivitamin . . . designed to support overall health and well-being for optimal vitality."

112. Nestlé Health Science's express affirmations of fact without disclosing the health risk posed by VM-75 formed a basis of the bargain that was reached when members of the proposed Nationwide Class purchased Solgar VM-75.

113. As described above, Solgar VM-75 is defective in that it poses a health risk.

114. As described above, the health risk posed by Solgar VM-75 was present at the time Solgar VM-75 was manufactured and sold.

115. The health risk posed by Solgar VM-75 substantially impairs the use and value of Solgar VM-75 to reasonable consumers, including Plaintiffs and members of the proposed Nationwide Class.

116. Nestlé Health Science breached its express warranties by supplying Solgar VM-75 to Plaintiffs and members of the proposed Nationwide Class.

117. On June 22, 2026, Plaintiff Higgins through his counsel sent a letter to Nestlé Health Science requesting relief for its breach of express warranty, including that Nestlé Health Science reimburse Mr. Higgins and all others who purchased Solgar VM-75 for the amount they spent purchasing Solgar VM-75 and that Nestlé Health Science cease making express affirmations of fact about VM-75 without disclosing the health risk posed by VM-75.

118. To date, Nestlé Health Science has not agreed to provide that relief.

119. Nestlé Health Science knew of the health risk posed by Solgar VM-75 when it expressly advertised Solgar VM-75, yet wrongfully and fraudulently concealed material facts regarding the defect, and induced Plaintiffs and members of the proposed Nationwide Class to purchase Solgar VM-75 under false and/or fraudulent pretenses.

120. Nestlé Health Science is obligated, under the terms of its express warranties, to compensate Plaintiffs and members of the proposed Nationwide Class for past harm and to permanently protect them and the public from future harm from the health risk posed by Solgar VM-75.

121. Nestlé Health Science breached its express warranties because it failed to provide to Plaintiffs or members of the proposed Class a product that conforms to the qualities and characteristics that it expressly warranted when it sold Solgar VM-75 to Plaintiffs and members of the proposed Nationwide Class—namely, a multivitamin that is safe to consume at the directed daily dose and free of the health risk posed by Solgar VM-75.

122. As a direct and proximate result of Nestlé Health Science's breach of express warranties, Plaintiffs and members of the proposed Nationwide Class received goods that had substantially impaired value at the point of sale, and they have suffered economic damages, including the purchase price they paid for Solgar VM-75 and/or the price premium attributable to Nestlé's failure to disclose the health risk posed by Solgar VM-75, in an amount to be determined at trial.

123. Plaintiffs seek against Nestlé Health Science a) actual damages, b) statutory damages, c) declaratory relief, d) injunctive relief, and e) pre- and post-judgment interest.

## SECOND CAUSE OF ACTION

## Breach of Implied Warranty

## (On behalf of Plaintiffs and the Proposed Nationwide Class against Nestlé Health Science only)

124. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

125. When it sold Solgar VM-75, Nestlé Health Science extended an implied warranty to Plaintiffs and members of the proposed Nationwide Class that Solgar VM-75 was merchantable and fit for the ordinary purpose for which such goods were sold and free of material defects.

126. Nestlé Health Science breached this implied warranty in that its Solgar VM-75 is (1) not fit for ordinary use; and (2) neither of merchantable quality nor free of material defects.

127. On June 22, 2026, Plaintiff Higgins through his counsel sent a letter to Nestlé Health Science requesting relief for its breach of implied warranty, including that Nestlé Health Science reimburse Mr. Higgins and all others who purchased Solgar VM-75 for the amount they spent purchasing Solgar VM-75 and that Nestlé Health Science provide adequate warnings on Solgar's packaging and all advertising about the health risk posed by Solgar VM-75.

128. To date, Nestlé Health Science has not agreed to provide that relief.

129. Plaintiffs and members of the proposed Nationwide Class are in privity of contract with Nestlé Health Science because they purchased Solgar VM-

75 that Nestlé Health Science designed, manufactured, warranted, marketed, and placed into the stream of commerce for sale to consumers, and Nestlé Health Science's warranties were directed to and intended to benefit those ultimate purchasers.

130. To the extent that Plaintiffs and members of the proposed Class lack privity of contract with Nestlé Health Science, no privity is required because a) Solgar VM-75 creates a health risk, and b) Plaintiffs and members of the proposed Nationwide Class were intended third-party beneficiaries of the transactions between Nestlé Health Science and its retailers.

131. As a direct and proximate result of Nestlé Health Science's breach of the implied warranty of merchantability, Plaintiffs and members of the proposed Nationwide Class received goods that had substantially impaired value at the point of sale, and they have suffered economic damages, including the purchase price and/or the price premium they paid for Solgar VM-75, in an amount to be determined at trial.

132. Plaintiffs seek against Nestlé Health Science a) actual damages, b) statutory damages, c) declaratory relief, d) injunctive relief, and e) pre- and post-judgment interest.

**<u>THIRD CAUSE OF ACTION</u>**
**Violations of New Jersey's Consumer Fraud Act**
**N.J. Stat. Ann. §§ 56:8-1, *et seq.***
**(On behalf of Plaintiffs and the Proposed Nationwide Class against all Defendants)**

133. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

134. Plaintiffs, members of the proposed Nationwide Class, Nestlé Health Science, and Nestlé S.A. are each a "person" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"). *See* N.J. Stat. Ann. § 56:8-1(d).

135. Solgar VM-75 is "merchandise" within the meaning of the New Jersey CFA. *See* N.J. Stat. Ann. § 56:8-1(c).

136. The New Jersey CFA prohibits unfair trade practices, encompassing "any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise." *See* N.J. Stat. Ann. § 56:8-2. The New Jersey CFA also prohibits schemes not to sell items as advertised. *See* N.J. Stat. Ann. § 56:8-2.2.

137. At all relevant times material hereto, Nestlé conducted trade and commerce in and from New Jersey.

138. The New Jersey CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes. *See* N.J. Stat. Ann. § 56:8-2.13.

139. Nestlé has engaged in unlawful, deceptive practices in the sale of Solgar VM-75 as alleged in more detail elsewhere herein, including: (1) selling Solgar VM-75 despite knowing that its 75 mg daily dose of vitamin B6 can cause peripheral neuropathy; and (2) failing to disclose and/or concealing this known health risk.

140. Nestlé knew of the health risk posed by Solgar VM-75 prior to the sale of Solgar VM-75, and no later than its August 9, 2021 acquisition of the Solgar brand, through sources including the decades of peer-reviewed medical literature, the long-standing foreign regulatory restrictions, and the regulatory actions described above.

141. Nestlé knowingly and intentionally omitted and failed to disclose material facts to Plaintiffs and members of the proposed Nationwide Class with respect to the health risk posed by Solgar VM-75, including the fact that, with normal use as directed, the 75 mg daily dose of vitamin B6 in Solgar VM-75 can cause peripheral neuropathy and exacerbate existing neuropathy, and/or misled them as to the true cause of those health risks.

142. Nestlé intended to deceive Plaintiffs and members of the proposed Nationwide Class and intended that Plaintiffs and members of the proposed Nationwide Class rely on Nestlé's misrepresentations, omissions, and acts of concealment, so that Plaintiffs and members of the proposed Class would purchase Solgar VM-75 notwithstanding its undisclosed health risks.

143. Plaintiffs and members of the proposed Nationwide Class, like all objectively reasonable consumers, did not expect that consuming Solgar VM-75 as directed would expose them to a known risk of peripheral neuropathy.

144. Nestlé had a duty to disclose the health risk posed by Solgar VM-75 to Plaintiffs and members of the proposed Nationwide Class because it:

a. Knew that the health risk posed by Solgar VM-75 was a material fact that would affect Plaintiffs' or members of the proposed Nationwide Class' decisions to buy Solgar VM-75;

b. Possessed exclusive knowledge of the health risk posed by Solgar VM-75;

c. Intentionally concealed the health risk posed by Solgar VM-75 from Plaintiffs and the members of the proposed Nationwide Class; and/or

d. Made incomplete representations about the quality and reliability of the foregoing generally, while purposefully withholding material facts

from Plaintiffs and members of the proposed Nationwide Class that contradicted these representations.

145. Had Nestlé disclosed all material information regarding the health risk posed by Solgar VM-75 to Plaintiffs and members of the proposed Nationwide Class, they would not have purchased Solgar VM-75 or would have paid less for it.

146. Furthermore, Nestlé has long been on notice of the health risk posed by Solgar VM-75 and of its violation of the New Jersey CFA from various sources.

147. Plaintiffs and members of the proposed Nationwide Class suffered ascertainable loss as a direct result of Nestlé's misrepresentations and omissions of material information. Plaintiffs and members of the proposed Nationwide Class received goods that had substantially impaired value at the point of sale, and suffered economic damages, including the purchase price and/or the price premium they paid for Solgar VM-75, in an amount to be determined at trial.

148. On June 22, 2026, Plaintiff Higgins through his counsel sent a letter to Nestlé Health Science requesting relief for violations of the New Jersey CFA, including that Nestlé Health Science reimburse Mr. Higgins and all others who purchased Solgar VM-75 for the amount they spent purchasing Solgar VM-75 and that Nestlé Health Science provide adequate warnings on Solgar's packaging and all advertising about the health risk posed by Solgar VM-75.

149. To date, Nestlé Health Science has not agreed to provide that relief.

150. Plaintiffs seek an order enjoining Nestlé's unfair, unlawful, and/or deceptive practices and declaratory relief, as well as actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. *See* N.J. Stat. Ann. § 56:8-19. In addition, Plaintiffs and members of the proposed Nationwide Class seek an award of punitive damages as to Nestlé Health Science only.

**FOURTH CAUSE OF ACTION**
**New Jersey Common Law Fraud by Concealment**
**(On behalf of Plaintiffs and the Proposed Nationwide Class against all Defendants)**

151. Plaintiffs, on behalf of themselves and the proposed Nationwide Class, repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

152. Nestlé concealed and suppressed material facts concerning the health benefits and risks of Solgar VM-75.

153. Nestlé is liable for both fraudulent concealment and nondisclosure. *See*, *e.g.*, Restatement (Second) of Torts §§ 550–551 (Am. L. Inst. 1977).

154. Nestlé concealed and suppressed material facts concerning the health risk posed by Solgar VM-75. Nestlé knew that Plaintiffs and members of the proposed Nationwide Class would not be able to inspect or otherwise detect the health risk posed by Solgar VM-75 prior to purchasing it.

155. Nestlé committed the foregoing acts and omissions in order to boost confidence in its products and falsely assure purchasers of Solgar VM-75 that it was safe to consume daily as directed, and concealed the information in order to prevent harm to Nestlé's and its products' reputations in the marketplace and to prevent consumers from learning of the health risk posed by Solgar VM-75 prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the safety and quality of Solgar VM-75 and because the representations and omissions played a significant role in the decision to purchase Solgar VM-75.

156. Plaintiffs and members of the proposed Nationwide Class, directly or indirectly, were exposed to Nestlé's advertisements and promotional materials prior to purchasing Solgar VM-75. The misleading statements about Solgar VM-75's safety and benefits, as well as Nestlé's omission of the truth about the health risk posed by Solgar VM-75, influenced Plaintiff and members of the proposed Nationwide Class' decisions to purchase Solgar VM-75. If Nestlé had instead chosen to disclose the truth, Plaintiffs and members of the proposed Nationwide Class would have seen those disclosures. Indeed, Plaintiffs and members of the proposed Nationwide Class would have had multiple opportunities to receive information about the health risks if Nestlé chose to disclose them, including on the product's labeling, on Nestlé's website, in radio or television advertisements,

brochures, press releases, or in other promotional materials, as well as in consumer forums and reviews.

157. Nestlé had a duty to disclose the health risk posed by Solgar VM-75 because the defect was known and/or accessible only to Nestlé; Nestlé had superior knowledge and access to the facts; and Nestlé knew the facts were not known to, or reasonably discoverable, by Plaintiffs and members of the proposed Nationwide Class. Nestlé also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in Solgar VM-75 as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding the health risks posed by Solgar VM-75.

158. The omitted and concealed facts were material because the risk that a daily multivitamin, taken as directed, can cause irreversible peripheral neuropathy and exacerbate existing neuropathy is precisely the kind of safety information that a reasonable consumer would consider material in deciding whether to purchase and ingest Solgar VM-75.

159. Nestlé actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation and sustain its marketing strategy, at the expense of Plaintiffs and members of the proposed Nationwide Class.

160. On information and belief, Nestlé has still not made full and adequate disclosure and continues to defraud Plaintiffs and members of the proposed Nationwide Class and conceal material information regarding the health risk posed by Solgar VM-75. Nestlé continues to deny the existence of the health risk posed by Solgar VM-75.

161. Plaintiffs and members of the proposed Nationwide Class were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Solgar VM-75, or would have paid less for it. Plaintiffs' and members of the proposed Nationwide Class' actions were justified because they had no way of knowing that the high amount of vitamin B6 in Solgar VM-75 caused peripheral neuropathy and exacerbated existing neuropathy. Rather, Nestlé was in exclusive control of the material facts and such facts were not known to the public, Plaintiffs, or members of the proposed Nationwide Class.

162. Because of the concealment and/or suppression of the facts, Plaintiffs and members of the proposed Nationwide Class sustained damage because they paid for Solgar VM-75 without knowledge of the health risks that Nestlé failed to disclose. Had they been aware of the health risk posed by Solgar VM-75, Plaintiffs and members of the proposed Nationwide Class would have paid less for Solgar VM-75 or would not have purchased it at all.

163. Plaintiffs and members of the proposed Nationwide Class suffered ascertainable economic loss as a direct result of Nestlé's misrepresentations and omissions of material information. Plaintiffs and members of the proposed Nationwide Class received goods that had substantially impaired value at the point of sale, and have suffered economic damages, including the purchase price and/or the price premium they paid for Solgar VM-75, in an amount to be determined at trial.

164. Nestlé's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs and members of the proposed Nationwide Class' rights and well-being to enrich Nestlé. Nestlé's conduct warrants an assessment of punitive damages against Nestlé Health Science in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

165. Plaintiffs and members of the proposed Nationwide Class are entitled to recover damages because they received goods that had a substantially impaired value at the point of sale, as well as actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees, and costs of suit. In addition, Plaintiffs and members of the proposed Nationwide Class seek an order enjoining Nestlé's unfair, unlawful, and/or deceptive practices, as well as declaratory relief.

166. Plaintiffs bring this claim on behalf of themselves and the proposed Nationwide Class, as there are no true conflicts among various states' laws of fraudulent concealment with respect to this factual context.

## FIFTH CAUSE OF ACTION
## New Jersey Common Law Unjust Enrichment
## (On behalf of Plaintiffs and the Proposed Nationwide Class against all Defendants)

167. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs as if fully set forth herein.

168. Nestlé has been unjustly enriched by Plaintiffs and members of the proposed Nationwide Class, who purchased Solgar VM-75 from Nestlé that they would not have purchased but for Nestlé's concealment of the known health risk posed by Solgar VM-75.

169. Specifically, Nestlé receives and appreciates a direct financial benefit from the sale of its Solgar VM-75 to end consumers, including Plaintiffs and members of the proposed Nationwide Class. Nestlé primarily sells Solgar VM-75 to retailers, which then sell it to end consumers. The sale of Nestlé's Solgar VM-75 to end consumers results in revenues which are either paid directly to Nestlé or used by the intermediaries to pay Nestlé for its products.

170. Plaintiffs and members of the proposed Nationwide Class unknowingly conferred a benefit on Nestlé of which Nestlé had knowledge, since Nestlé was aware of the defective nature of Solgar VM-75, but failed to disclose

this knowledge and misled Plaintiffs and the members of the proposed Nationwide Class regarding the nature and quality of the subject Solgar VM-75 while profiting from this deception.

171. The circumstances are such that it would be inequitable, unconscionable, and unjust to permit Nestlé to retain the benefit of revenue that it unfairly obtained from Plaintiffs and members of the proposed Nationwide Class. This revenue included the premium price Plaintiffs and members of the proposed Nationwide Class paid for Solgar VM-75 without being aware of the health risk posed by Solgar VM-75.

172. Plaintiffs and the other members of the proposed Nationwide Class, having been damaged by Nestlé's conduct, are entitled to recover or recoup damages and/or restitution as a result of the unjust enrichment of Nestlé to their detriment.

173. Plaintiffs bring this claim on behalf of themselves and members of the proposed Nationwide Class, as there are no true conflicts among various states' laws of unjust enrichment in this factual context.

174. In the alternative, Plaintiffs brings this claim on behalf of State Classes, which can be subdivided into a small number of groups to reflect any material differences in the law with respect to Plaintiff's claims.

175. In the alternative, Plaintiffs bring this claim on behalf of State Subclasses, which can be subdivided into a small number of groups to reflect any material differences in the law with respect to Plaintiffs' claims.

**SIXTH CAUSE OF ACTION**
**Violations of the California Consumers Legal Remedies Act (CLRA)**
**California Civil Code § 1750 *et seq*.**
**(Brought in the alternative on behalf of Plaintiff Shah and the Proposed California Subclass against all Defendants)**

176. Plaintiff Shah, on behalf of himself and the members of the proposed California Subclass, repeats and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

177. This claim is brought on behalf of Plaintiff Shah and the proposed California Subclass to seek injunctive relief against Defendants under the CLRA, Cal. Civ. Code § 1750 *et seq*.

178. Plaintiff Shah, members of the proposed California Subclass, Nestlé Health Science, and Nestlé S.A. are each a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

179. Plaintiff Shah and Subclass Members are "consumers" within the meaning of the CLRA, as defined by Cal. Civ. Code § 1761(d), who purchased Solgar VM-75.

180. The CLRA prohibits unfair or deceptive trade practices that violated section 1770(a), as described above and below, by, among other things, failing to

disclose the safety risks associated with Solgar VM-75 and by representing that Solgar VM-75 had characteristics it did not have. *See* Cal. Civ. Code §§ 1770(a)(5), (a)(7), (a)(9).

181. Nestlé knew or should have known of the health risk posed by Solgar VM-75 prior to the sale of Solgar VM-75, and no later than its August 9, 2021 acquisition of the Solgar brand, through sources including the decades of peer-reviewed medical literature, the long-standing foreign regulatory restrictions, and the regulatory actions described above.

182. Nestlé's unfair and deceptive acts or practices occurred repeatedly in its course of trade or business, were material, and were capable of deceiving a substantial portion of the purchasing public, including Plaintiff Shah and the members of the proposed California Subclass.

183. Nestlé was under a duty to Plaintiff Shah and the members of the proposed California Subclass to disclose the dangerous nature of Solgar VM-75 because:

a. Nestlé was in a superior position to know the true safety risks associated with Solgar VM-75;

b. Plaintiff Shah and the members of the proposed California Subclass could not reasonably been expected to learn or discovery that ingestion of Solgar VM-75 carried significant safety risks;

c. Nestlé knew that Plaintiff Shah and the members of the proposed California Subclass could not reasonably have been expected to learn or discover the defect in Solgar VM-75;

d. Nestlé knew the dangerous nature of Solgar VM-75 was a material fact that would affect Plaintiff Shah's and Subclass Members' decisions to buy Solgar VM-75;

e. Nestlé intentionally concealed the dangerous nature of Solgar VM-75 from Plaintiff Shah and the members of the proposed California Subclass.

f. Nestlé made representations about the quality and benefits of Solgar VM-75, while suppressing information about the true safety risks associated with consumption of Solgar VM-75.

184. The facts that were misrepresented, concealed, or not disclosed by Nestlé to Plaintiff Shah and the members of the proposed California Subclass are material in that a reasonable consumer would have considered them important in deciding whether or not to purchase Solgar VM-75. Had Plaintiff Shah and other members of the proposed California Subclass known about the true nature and quality of Solgar VM-75, they would not have purchased Solgar VM-75 or would have paid significantly less than they did for Solgar VM-75.

185. Plaintiff Shah and Sublass Members are reasonable consumers who expect that Solgar VM-75 is safe to use as directed and beneficial to their general health.

186. As a result of Nestlé's conduct of unfair or deceptive acts or practices, Plaintiff Shah and Subclass Members suffered actual damages in that their Solgar VM-75 do not have the safety profile as represented and are not worth the amount paid, and Nestlé has deprived Plaintiff Shah and Subclass Members of the benefit of the bargain.

187. Plaintiff Shah and the members of the proposed California Subclass seek an order enjoining Nestlé;s unfair or deceptive acts or practices, equitable relief, an award of attorneys' fees and costs under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

188. In addition, many members of the proposed California Subclass are senior citizens or disabled persons, as defined by Cal. Civ. Code § 1761(f), (g), who suffered substantial economic damage resulting from Nestlé's fraudulent representations regarding Solgar VM-75. Each of those class members is entitled to up to an additional $5,000. Cal. Civ. Code § 1780(b).

189. In accordance with section 1782(a) of the CLRA, on October 20, 2026, counsel for Plaintiff Shah sent notices by certified mail to Nestlé S.A. and Nestlé Health Science US, notifying Nestlé Health Science US of its alleged

violations of § 1750, *et seq*. and other state consumer statutes related to their marketing, promotion, and sale of Solgar VM-75, and demanding they correct or agree to correct the actions described therein within thirty (30) days of the notice letter. If Nestlé fails to do so, Plaintiff Shah will amend this Complaint to include a request for compensatory and punitive damages on behalf of himself and the members of the proposed California Subclass pursuant to California Civil Code § 1782(d).

190. Plaintiff Shah thus seeks injunctive relief based on the conduct described herein, as well as other relief the Court deems proper.

**SEVENTH CAUSE OF ACTION**
**Breach of Implied Warranty of Merchantability - Song-Beverly Consumer Warranty Act**
**Cal. Civ. Code §§ 1790 *et seq*.**
**(Brought in the alternative on behalf of Plaintiff Shah and the Proposed California Subclass against Nestlé Health Science only)**

191. Plaintiff Shah, on behalf of himself and the members of the proposed California Subclass, repeats and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

192. Plaintiff Shah and members of the California Subclass are "buyers" within the meaning of Cal. Civ. Code § 1791(b). The Solgar VM-75 are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a). Nestlé Health Science US is a "manufacturer" and/or "distributor" of consumer goods within the meaning of Cal. Civ. Code § 1791(e) and (j).

193. Plaintiff Shah and members of the California Subclass bought Solgar VM-75 manufactured, distributed, and marketed to them by Nestlé Health Science US and that Nestlé Health Science US intended to be purchased by consumers such as them. Nestlé Health Science US impliedly warranted to Plaintiff Shah and members of the California Subclass that Solgar VM-75 was "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792.

194. Cal. Civ. Code § 1791.1(a) provides that consumer goods must meet the following requirements in order to fulfill the implied warranty of merchantability: "(1) Pass without objection in the trade under the contract description; (2) Are fit for the ordinary purposes for which such goods are used; (3) Are adequately contained, packaged, and labeled; and (4) Conform to the promises or affirmations of fact made on the container or label."

195. Nestlé Health Science breached this implied warranty in that its Solgar VM-75 is (1) not fit for the ordinary purposes for which such goods are used; and (2) are not adequately contained, packaged, and labeled.

196. On October 20, 2026, Plaintiff Shah through his counsel sent a letter to Nestlé Health Science requesting relief for its breach of implied warranty, including that Nestlé Health Science reimburse Mr. Shah and all others California residents who purchased Solgar VM-75 for the amount they spent purchasing Solgar VM-75 and that Nestlé Health Science provide adequate warnings on

Solgar's packaging and all advertising about the health risk posed by Solgar VM-75.

197. Plaintiff Shah thus seeks injunctive relief based on the conduct described herein, as well as other relief the Court deems proper.

**<u>EIGHTH CAUSE OF ACTION</u>**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200 *et seq*.**
**(Brought in the alternative on behalf of Plaintiff Shah and the Proposed California Subclass against all Defendants)**

198. Plaintiff Shah, on behalf of himself and the California Subclass, repeats and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

199. California Business and Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice."

200. Nestlé's conduct as alleged herein was unlawful because it violated multiple statutes and the common law, including the CLRA, the Song-Beverly Consumer Warranty Act, and the common law prohibiting fraudulent concealment.

201. Nestlé has violated § 17200 by knowingly selling Solgar VM-75 without disclosing to Plaintiff Shah and members of the members of the proposed California Subclass the health risk posed by VM-75. Nestlé's conduct was unscrupulous, offensive to established public policy, and fraudulent, and the harm caused by Nestlé's misconduct greatly outweighs any benefit to consumers.

202. Plaintiff Shah and members of the proposed California Subclass would not have purchased Solgar VM-75 or would not have paid as much for them but for Nestlé's omissions. Nestlé failed to disclose material information about Solgar VM-75 in a manner that is likely to—and did—deceive consumers and the public. All of the misconduct alleged herein occurred in the conduct of Nestlé's business.

203. Plaintiff Shah, individually and on behalf of members of the proposed California subclass, requests that this Court enjoin Nestlé's unlawful, unfair, and fraudulent practices and restore to them any money acquired by Nestlé via unfair competition, including restitution and/or restitutionary disgorgement.

## NINTH CAUSE OF ACTION
## California Common Law Fraud by Concealment
## (Brought in the alternative on behalf of Plaintiff Shah and the Proposed California Subclass against all Defendants)

204. Plaintiff Shah, on behalf of himself and the proposed California Subclass, repeats and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

205. Nestlé concealed and suppressed material facts concerning the health benefits and risks of Solgar VM-75.

206. Nestlé is liable for both fraudulent concealment and nondisclosure under the common law of California

207. Nestlé concealed and suppressed material facts concerning the health risk posed by Solgar VM-75. Nestlé knew that Plaintiff Shah and members of the proposed California Subclass would not be able to inspect or otherwise detect the health risk posed by Solgar VM-75 prior to purchasing it.

208. Nestlé committed the foregoing acts and omissions in order to boost confidence in its products and falsely assure purchasers of Solgar VM-75 that it was safe to consume daily as directed, and concealed the information in order to prevent harm to Nestlé's and its products' reputations in the marketplace and to prevent consumers from learning of the health risk posed by Solgar VM-75 prior to their purchase. These false representations and omissions were material to consumers, both because they concerned the safety and quality of Solgar VM-75 and because the representations and omissions played a significant role in the decision to purchase Solgar VM-75.

209. Plaintiff Shah and members of the proposed California Subclass, directly or indirectly, were exposed to Nestlé's advertisements and promotional materials prior to purchasing Solgar VM-75. The misleading statements about Solgar VM-75's safety and benefits, as well as Nestlé's omission of the truth about the health risk posed by Solgar VM-75, influenced Plaintiff Shah and members of the proposed California Subclass' decisions to purchase Solgar VM-75. If Nestlé had instead chosen to disclose the truth, Plaintiff Shah and members of the

proposed California Subclass would have seen those disclosures. Indeed, Plaintiff Shah and members of the proposed California Subclass would have had multiple opportunities to receive information about the health risks if Nestlé chose to disclose them, including on the product's labeling, on Nestlé's website, in radio or television advertisements, brochures, press releases, or in other promotional materials, as well as in consumer forums and reviews.

210. Nestlé had a duty to disclose the health risk posed by Solgar VM-75 because the defect was known and/or accessible only to Nestlé; Nestlé had superior knowledge and access to the facts; and Nestlé knew the facts were not known to, or reasonably discoverable, by Plaintiff Shah and members of the proposed California Subclass. Nestlé also had a duty to disclose because it made many general affirmative representations about the quality, warranty, and lack of defects in Solgar VM-75 as set forth above, which were misleading, deceptive, and/or incomplete without the disclosure of the additional facts set forth above regarding the health risks posed by Solgar VM-75.

211. The omitted and concealed facts were material because the risk that a daily multivitamin, taken as directed, can cause irreversible peripheral neuropathy and exacerbate existing neuropathy is precisely the kind of safety information that a reasonable consumer would consider material in deciding whether to purchase and ingest Solgar VM-75.

212. Nestlé actively concealed and/or suppressed these material facts, in whole or in part, to protect its reputation and sustain its marketing strategy, at the expense of Plaintiff Shah and members of the proposed California Subclass.

213. On information and belief, Nestlé has still not made full and adequate disclosure and continues to defraud Plaintiff Shah and members of the proposed California Subclass and conceal material information regarding the health risk posed by Solgar VM-75. Nestlé continues to deny the existence of the health risk posed by Solgar VM-75.

214. Plaintiff Shah and members of the proposed California Subclass were unaware of these omitted material facts and would not have acted as they did had they known of the concealed and/or suppressed facts, *i.e.*, they would not have purchased Solgar VM-75, or would have paid less for it. Plaintiff Shah's and members of the proposed California Subclass' actions were justified because they had no way of knowing that the high amount of vitamin B6 in Solgar VM-75 caused peripheral neuropathy and exacerbated existing neuropathy. Rather, Nestlé was in exclusive control of the material facts and such facts were not known to the public, Plaintiff Shah, or members of the proposed California Subclass.

215. Because of the concealment and/or suppression of the facts, Plaintiff Shah and members of the proposed California Subclass sustained damage because they paid for Solgar VM-75 without knowledge of the health risks that Nestlé

failed to disclose. Had they been aware of the health risk posed by Solgar VM-75, Plaintiff Shah and members of the proposed California Subclass would have paid less for Solgar VM-75 or would not have purchased it at all.

216. Plaintiff Shah and members of the proposed California Subclass suffered ascertainable economic loss as a direct result of Nestlé's misrepresentations and omissions of material information. Plaintiff Shah and members of the proposed California Subclass received goods that had substantially impaired value at the point of sale, and have suffered economic damages, including the purchase price and/or the price premium they paid for Solgar VM-75, in an amount to be determined at trial.

217. Nestlé's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff Shah's and members of the proposed California Subclass' rights and well-being to enrich Nestlé. Nestlé's conduct warrants an assessment of punitive damages against Nestlé Health Science in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

218. Plaintiff Shah and members of the proposed California Subclass are entitled to recover damages because they received goods that had a substantially impaired value at the point of sale, as well as actual damages, together with appropriate penalties, including but not limited to treble damages, attorneys' fees,

and costs of suit. In addition, Plaintiff Shah and members of the proposed California Subclass seek an order enjoining Nestlé's unfair, unlawful, and/or deceptive practices, as well as declaratory relief.

**<u>TENTH CAUSE OF ACTION</u>**
**California Common Law Unjust Enrichment**
**(Brought in the alternative on behalf of Plaintiff Shah and the Proposed California Subclass against all Defendants)**

219. Plaintiff Shah repeats and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

220. Nestlé has been unjustly enriched by Plaintiff Shah and members of the proposed California Subclass, who purchased Solgar VM-75 from Nestlé that they would not have purchased but for Nestlé's concealment of the known health risk posed by Solgar VM-75.

221. Specifically, Nestlé receives and appreciates a direct financial benefit from the sale of its Solgar VM-75 to end consumers, including Plaintiff Shah and members of the proposed California Subclass. Nestlé primarily sells Solgar VM-75 to retailers, which then sell it to end consumers. The sale of Nestlé's Solgar VM-75 to end consumers results in revenues which are either paid directly to Nestlé or used by the intermediaries to pay Nestlé for its products.

222. Plaintiff Shah and members of the proposed California Subclass unknowingly conferred a benefit on Nestlé of which Nestlé had knowledge, since Nestlé was aware of the defective nature of Solgar VM-75, but failed to disclose

this knowledge and misled Plaintiffs and the members of the proposed California Subclass regarding the nature and quality of the subject Solgar VM-75 while profiting from this deception.

223. The circumstances are such that it would be inequitable, unconscionable, and unjust to permit Nestlé to retain the benefit of revenue that it unfairly obtained from Plaintiffs and members of the proposed California Subclass. This revenue included the premium price Plaintiffs and members of the proposed California Subclass paid for Solgar VM-75 without being aware of the health risk posed by Solgar VM-75.

224. Plaintiffs and the members of the proposed California Subclass, having been damaged by Nestlé's conduct, are entitled to recover or recoup damages and/or restitution as a result of the unjust enrichment of Nestlé to their detriment.

## X. INDIVIDUAL CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violation of New Jersey Product Liability Act
### N.J.S.A. § 2A:58C-1 *et seq.*
### Strict Products Liability—Failure to Warn and Design Defect
### (On behalf of Plaintiff Higgins individually against Nestlé S.A. and Nestlé Health Science)

225. Plaintiff Higgins repeats and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

226. At all relevant times, in the course of their business, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, packaged, labeled, supplied, distributed, and/or sold the Solgar VM-75 ingested by Plaintiff Higgins.

227. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, promotion, advertising, packaging, labeling, supplying, distribution, and/or sale of Solgar VM-75 into the stream of commerce, including a duty to warn of dangers that they knew or should have known on the basis of reasonably obtainable or available knowledge.

228. Defendants' Solgar VM-75 was expected to and did reach the usual customers, handlers, and persons coming into contact with said products without substantial change in the condition in which they were produced, manufactured, labeled, marketed, supplied, distributed, and/or sold by Defendants.

229. At all relevant times, including before and at the times Defendants' Solgar VM-75 left their control, Defendants knew or should have known that Solgar VM-75 was defective and unreasonably dangerous because it failed to contain adequate warnings of the risk of peripheral neuropathy associated with the prolonged ingestion of its 75 mg daily dose of vitamin B6, when used in the form and manner as provided by Defendants.

230. Defendants knew or should have known of the causal association between the prolonged ingestion of vitamin B6, as contained in Solgar VM-75, and the risk of developing peripheral neuropathy, but they ignored this association. Defendants' actual and constructive knowledge derived from well-established medical and scientific literature, yet Solgar VM-75 bore no warning of that risk. Regulatory authorities, including the Australian Therapeutic Goods Administration, have expressly rejected the contention that this risk arises only at very high doses or with long-term use.

231. At all relevant times, Defendants knew or should have known that Solgar VM-75 had not been adequately tested for safety.

232. Despite the fact that Defendants knew or should have known that prolonged ingestion of vitamin B6, as contained in Solgar VM-75 is causally associated with peripheral neuropathy and had not be sufficiently and/or adequately tested for safety, Defendants continued to market, distribute, and/or sell their Solgar VM-75 to consumers, including Plaintiff Higgins, without adequate warnings.

233. At all relevant times, Defendants reasonably foresaw, anticipated, expected, and knew or should have known that individuals, such as Plaintiff Higgins, would use and/or consume Solgar VM-75 for its ordinary purposes and

would foreseeably suffer injury as a result of the inadequate warnings and defects described herein.

234. At all relevant times, given its increased safety risks and inadequate warnings, Solgar VM-75 was not reasonably fit, suitable, or safe for the ordinary purposes for which they were intended.

235. At all relevant times, given its increased safety risks and inadequate warnings, Defendants' Solgar VM-75 did not meet the reasonable expectations of an ordinary consumer, particularly Plaintiff Higgins.

236. At all relevant times, Plaintiff Higgins was using Solgar VM-75 for the purpose and in a manner normally intended—namely, as a dietary supplement to improve his health and well-being.

237. The Solgar VM-75 designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to inadequate warnings or instructions, as Defendants knew or should have known that the product created risks of serious and dangerous injuries, including peripheral neuropathy, when used as directed, and Defendants failed to adequately warn of this risk.

238. The Solgar VM-75 designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective due to improper testing and/or warnings, because after Defendants knew or should

have known of the risks of serious and dangerous injuries, including peripheral neuropathy, Defendants failed to provide adequate labelings and continued to improperly test, advertise, market, and/or promote the Solgar VM-75.

239. The labeling for Solgar VM-75 was inadequate because it did not warn of the risks of peripheral neuropathy that is causally associated with prolonged ingestion of the product.

240. The labeling for Solgar VM-75 is inadequate because it did not warn that Solgar VM-75 had not been sufficiently or adequately tested for safety when used as directed.

241. The promotion and marketing of VM-75 by Defendants to Plaintiff Higgins was inadequate because Defendants failed to warn of the safety risks associated with prolonged ingestion of VM-75.

242. The unreasonably dangerous characteristics of Defendants' Solgar VM-75 were beyond that which would be contemplated by the ordinary user, such as Plaintiff Higgins, with the ordinary knowledge common to the public as to the product's characteristics.

243. Plaintiff Higgins had no way to determine the truth behind the inadequacies of Defendants' warnings as identified herein, and Plaintiff Higgin's reliance upon Defendants' warnings was reasonable.

244. If Plaintiff Higgins had been warned of the increased risk of developing peripheral neuropathy associated with prolonged ingestion of Solgar VM-75, then Mr. Higgins would not have purchased or ingested Solgar VM-75, or would have discontinued its use before sustaining injury.

245. If Plaintiff Higgins had been warned that Solgar VM-75 had not been sufficiently and/or adequately tested for safety risks, including peripheral neuropathy, Mr. Higgins would not have purchased or ingested Solgar VM-75, or would have discontinued its use before sustaining injury.

246. Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, packaged, labeled, supplied, distributed, and/or sold a defective product, which created unreasonable risks to the health of consumers and to Plaintiff Higgins in particular, and Defendants are therefore liable for the injuries sustained by Mr. Higgins.

247. As a direct and proximate result of the inadequate warnings, Mr. Higgins developed vitamin B6 toxicity and peripheral neuropathy and suffered severe personal injuries, including physical pain, mental anguish, diminished enjoyment of life, and fear of further worsening of the above-named health consequences.

248. As a result of the foregoing acts and omissions, Plaintiff Higgins did incur medical, health, incidental, and related expenses.

249. By reason of the foregoing, Defendants have become liable to Plaintiff Higgins for the designing, manufacturing, labeling, promoting, supplying, distributing, and/or selling of an unreasonably dangerous product with inadequate warnings.

250. Defendants' inadequate warnings for Solgar VM-75 and the other acts and omissions described above amounted to wanton and willful disregard by Defendants of persons and foreseeably might be harmed by their conduct, and/or actual malice or reckless indifference to the likelihood of harm and other consequences of their conduct.

251. Defendants' conduct was committed with knowing, conscious, and deliberate disregard for the safety and rights of consumers, including Plaintiff Higgins, there by entitling Plaintiff Higgins to punitive damages in the amount appropriate to punish Defendants and deter them from similar conduct in the future.

252. Consequently, Defendants are liable for punitive damages in an amount to be determined by the jury.

## SECOND CAUSE OF ACTION
## Breach of Express Warranty
## N.J.S.A. § 12A:2-313 – Against All Defendants

253. Plaintiff Higgins repeats and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

254. At all relevant times, Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, packaged, labeled, supplied, distributed, and/or sold Solgar VM-75.

255. At all relevant times, Defendants expressly warranted to Plaintiff Higgins that Solgar VM-75 is safe as a vitamin supplement to improve general health and well-being.

256. The aforementioned express warranties were made to Plaintiff Higgins by way of the product labels, websites, advertisements, and promotional materials for Solgar VM-75. As a result of Defendants' express warranties, Mr. Higgins was induced to purchase and ingest Solgar VM-75.

257. At all relevant times, Defendants reasonably foresaw, anticipated, and expected that individuals such as Plaintiff Higgins would use and/or consume Solgar VM-75 based upon their express warranties.

258. At all relevant times, Defendants knew of should have known that Solgar VM-75 was unreasonably dangerous because of the increased risk of peripheral neuropathy associated with prolonged use of vitamin B6 supplements, such as Solgar VM-75, when used in the form and manner as provided by Defendants.

259. At all relevant times, Defendants knew or should have known that Solgar VM-75 had not been sufficiently and/or adequately tested for safety risks.

260. The unreasonably dangerous characteristics of Solgar VM-75 were beyond that which would be contemplated by the ordinary user, such as Plaintiff Higgins, with the ordinary knowledge common to the public as to the drugs' characteristics.

261. At the time Solgar VM-75 left Defendants' control, it did not confirm to Defendants' express warranties because it was not safe to use as a dietary supplement to improve general health and well-being, in that it was causally associated with an increased risk of peripheral neuropathy and vitamin B6 toxicity.

262. Defendants materially failed to confirm Solgar VM-75 to the representations in their product labels, websites, advertisements, and promotional materials, which Plaintiff Higgins used in direct or indirect reliance upon Defendants' express representations. Such failures by Defendants constitute a material breach of express warranties made, directly or indirectly, to Plaintiff Higgins concerning Solgar VM-75.

263. The express warranties made by Defendants regarding the safety, effectiveness, and other properties of Solgar VM-75 were made with the intent to induce Plaintiff Higgins to use the product.

264. Defendants knew or should have known that by making the express warranties to Plaintiff Higgins, it would be the natural tendency of Mr. Higgins to use Solgar VM-75.

265. Plaintiff Higgins relied on the express warranties of Defendants identified herein.

266. If Defendants had not made these express warranties, then Plaintiff Higgins would not have purchased and used Solgar VM-75.

267. If Plaintiff Higgins had been warned of the increased risk of vitamin B6 toxicity and peripheral neuropathy causally associated with Solgar VM-75, then Mr. Higgins would not have purchased and ingested the product or suffered from vitamin B6 toxicity and peripheral neuropathy.

268. Defendants' aforementioned express warranties were part of the basis of the parties' bargain for the products.

269. Plaintiff Higgin's injuries and damages were directly caused by Defendants' breach of the aforementioned warranties.

270. Plaintiff Higgin's injuries arose from Mr. Higgin's reasonably anticipated use of Solgar VM-75.

271. Accordingly, Defendants are liable as a result of their breach of express warranties.

272. As a result of the foregoing breaches, Plaintiff Higgins was caused to suffer serious and dangerous injuries, including physical pain, mental anguish, diminished enjoyment of life, and fear of the worsening of the conditions described above.

273. As a result of the foregoing acts and omissions, Plaintiff Higgins did incur medical, health, incidental, and related expenses, and Mr. Higgins presently requires and/or will in the future require more health care and services. Plaintiff Higgins is informed and believes and alleges that he will require future medical and/or hospital care, attention, and services.

## XI. RELIEF REQUESTED

274. Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court enter judgment against Nestlé and grant the following relief on the class claims:

a. an order certifying the proposed Class and/or any appropriate subclasses, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

b. a declaration stating that Solgar VM-75 poses a health risk and/or is not merchantable—namely, that its daily dose of vitamin B6 creates a risk of peripheral neuropathy—that Nestlé was required to disclose. *See Pella Corp. v. Saltzman*, 606 F.3d 391, 392 (7th Cir. 2010);

c. an order enjoining Nestlé from further deceptive distribution and sales practices with respect to Solgar VM-75, and to permanently reformulate Solgar VM-75 so that it no longer possesses unsafe levels of vitamin B6;

d. an award to Plaintiffs and members of the proposed Class and/or subclasses of compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial against both Nestlé S.A. and Nestlé Health Science, and punitive damages as to Nestlé Health Science only;

e. an order requiring Nestlé to disgorge, for the benefit of Plaintiffs and members of the proposed Class and/or subclasses, all or part of the ill-gotten revenue it received from the sale of Solgar VM-75, or make full restitution thereof to Plaintiffs and members of the proposed Class and/or subclasses;

f. an award of attorneys' fees and costs, as allowed by law;

g. an award of pre-judgment and post-judgment interest, as provided by law;

h. leave to amend this Complaint to conform to the evidence obtained in discovery or produced at trial; and

i. such other relief as may be appropriate under the circumstances.

275. On his individual claims, Plaintiff Higgins further requests that the Court enter judgment against Nestlé and award the following relief: (a) compensatory damages for his personal injuries, including past and future medical expenses, pain and suffering, and loss of enjoyment of life; (b) punitive damages;

(c) pre-judgment and post-judgment interest, as provided by law; and (d) such other and further relief as the Court deems just and proper.

## XII. DEMAND FOR JURY TRIAL

276. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: October 21, 2026 SEEGER WEISS, LLP

By: __/s/ Christopher A. Seeger
Christopher A. Seeger

Christopher A. Seeger
David R. Buchanan
Gala Grand
SEEGER WEISS LLP
55 Challenger Road
Ridgefield Park, New Jersey 07660
Tel: 888-546-8799
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
ggrand@seegerweiss.com

Jonathan D. Selbin (*pro hac vice* pending)
Daniel P. Chiplock (*pro hac vice* pending)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9000
jselbin@lchb.com
dchiplock@lchb.com

Christopher E. Coleman (*pro hac vice* pending)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
222 Second Avenue South, Suite 1640
Nashville, TN 37201
Telephone: (615) 313-9000
ccoleman@lchb.com

*Attorneys for Named Plaintiffs and Proposed Class*